**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WILLIAM SCOTT, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs | ) | Civil Action No. 2:20-1703 |
| | ) | |
| UNITED PARCEL SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Plaintiff William Scott, Jr. ("Scott") brings this action against Defendant United Parcel Service, Inc. ("UPS"), alleging claims of racial discrimination and retaliation under 42 U.S.C. § 1981. Scott contends that UPS subjected him to a racially hostile work environment based on an incident in which he discovered a stuffed animal hanging overhead by its neck near his workspace. He further alleges that UPS later retaliated against him by suspending him from his employment.

Currently pending before the Court is the motion for summary judgment of UPS.[1] For the reasons that follow, the motion will be granted.

**I.   Relevant Procedural History**

Scott commenced this action on November 6, 2020. His claims assert violations of 42 U.S.C. § 1981. The original Complaint asserts a claim of a racially hostile work environment in Count I and a claim of retaliation in Count II. Scott later filed an Amended Complaint in which he asserted another retaliation claim (Count III).[2]  Federal question subject matter jurisdiction is

---

[1] The parties have consented to have a magistrate judge conduct all proceedings in this case, including trial and entry of final judgment, pursuant to 28 U.S.C. § 636(c)(1).

[2] Scott's retaliation claim in Count II included other alleged incidents that followed his report

asserted over these claims.

After the close of discovery, UPS filed a timely motion for summary judgment (ECF No. 48), which has been fully briefed (ECF Nos. 39, 53, 55). Oral argument was held on December 28, 2021.

## II.   **Factual Background**

### A.  Discovery and Investigation of Hanging Stuffed Animal

Scott, who is Black, is employed as a mail sorter at a UPS facility in New Stanton, Pennsylvania. He has been continuously employed by UPS since 1992 and has been in the same position since 1997. (Defendant's Concise Statement of Material Facts ("DCSMF") ¶¶ 1-3) (ECF No. 50.)

On the morning of Friday, April 5, 2019, Scott noticed a stuffed animal that was suspended from a support beam in the warehouse that was approximately ten feet from his workspace and fifteen to twenty feet overhead. Scott was the only Black employee working in this part of the facility. (Plaintiff's Responsive Concise Statement of Material Facts ("PRCSMF") ¶ 4) (ECF No. 54.)  Scott thought it was a gray stuffed monkey and took a picture of it.[3] He did not know who placed the monkey there.[4] (*Id.* ¶ 12.) He reported this to his supervisor, Michael Teaters ("Teaters"). Scott showed Teaters the photo and said, "can you

---

about the stuffed animal. In response to UPS's motion for summary judgment, however, he conceded to the dismissal of all incidents other than his suspension in 2021, which is set forth in Count III of the Amended Complaint. (ECF No. 53 at 13.)

[3] Scott disputes that he called it a "gray stuffed animal" at that time. (PRCSMF ¶ 40.) However, the incident report authored by Scott (ECF No. 50 Ex. C Ex. 12) uses this phrase. The Complaint and Amended Complaint refer to the stuffed animal as a "grey monkey." (ECF No. 1 ¶ 25(c).) Scott disputes UPS's statement that the picture was too blurry to tell what it depicted. (PRCSMF ¶¶ 5-7.)

[4] Scott objects to the statement that he did not know who hung the monkey as irrelevant. (PRCSMF ¶ 12.) Although the statement that Scott did not know who hung the monkey is neutral on its face, UPS argues in its brief that this fact precludes Scott from demonstrating that the act was done "intentionally." This is incorrect as a matter of law, as explained herein.

please, when you take it down, bring it back and show me what it is so I can look at it?" (*Id.* ¶¶ 4-7, 10-11.)

Shortly after speaking with Scott, Teaters walked to the vicinity of where the stuffed animal was located. Teaters needed a shepherd's hook to retrieve it because of the height from which it was hanging. He contends that the stuffed animal he retrieved was a sloth, not a monkey. He describes it as blueish green or teal in color with black around its eyes and indicates that its hands were wrapped around a support beam and connected with Velcro. Teaters does not know who placed the animal there. (DCSMF ¶¶ 8, 14-18.) Scott disagrees, asserting that it was a monkey that it was hanging from its neck, as is clearly visible in the photo he took. (PRCSMF ¶ 17.)[5]

When Scott went back to the work area later that day, the monkey had been removed. (DCSMF ¶ 9.)  It is undisputed that it was removed on April 5, 2019, the day Scott reported it to Teaters. (ECF No. 54 Ex. E, UPS 145.) However, Scott was upset because Teaters never brought the monkey back to him. Instead, Teaters gave it to another employee, Eric Hixon, to put in a room for "over goods," that is, items that have either fallen out of a package or that cannot be connected to a particular package. (*Id.* ¶¶ 13, 20-22.) Scott notes that UPS policy requires certain paperwork to be completed for "over goods" and that no such paperwork has been produced in this case. (PRCSMF ¶¶ 21-22.) He further asserts that Teaters' failure to bring the monkey back to him "compels the logical conclusion that Teaters did not want Scott to be able to prove the animal that was hanging from the neck ten feet away from where Scott worked was a monkey."

---

[5] Throughout its brief and concise statement, UPS asserts that the animal was a blue sloth and that it was attached to the support beam by Velcro on its hands. In viewing the photo (ECF No. 50 Ex. I), although the color and type of animal cannot be conclusively determined, it is clear that its arms are not wrapped around any object but rather, are suspended downward. That is, the animal is attached in some manner from a support beam above. For purposes of this opinion, the Court accepts Scott's version of the facts that it was a monkey hanging by its neck.

Based upon Teaters' failure to preserve the monkey, Scott hypothesizes that Teaters' conduct was intentional and done to sabotage an investigation into who hung the monkey "because he was the one who hung it." (PRCSMF ¶¶ 13, 15, 18.) This speculation is not supported by anything the record, however, and as explained below, whether Teaters hung the monkey is irrelevant to the resolution of the issues in this case.

The following Monday, Scott asked Hub Manager Shawn Dunn ("Dunn"), Teaters' supervisor, if Teaters had informed him about the monkey. According to Scott, Dunn immediately denied hanging the monkey even though he was not accused of doing so. Scott concludes that this response could lead a jury to conclude that Dunn hung the monkey. (PRCSMF ¶¶ 12, 18, 24-25, 74.) By contrast, Dunn testified that he first learned about the stuffed animal from a full-time supervisor and that his response was to get Human Resources and UPS Security involved to investigate. (Defendant's Responsive Concise Statement of Material Facts ("DRCSMF") ¶ 74) (ECF No. 56.) At any rate, neither Scott's speculation about Dunn's reaction nor whether Dunn hung the monkey is dispositive to the issues in this case.

UPS states that, once the monkey was removed, Teaters concluded that there was nothing further that he needed to do. (DCSMF ¶ 19.)[6] Scott gave contradictory testimony regarding this issue. At his deposition, he testified as to the reason that he wanted Teaters to bring the monkey back to him:

> Because I thought if he brought it back, we can handle it; and from there, maybe go to Human Resources and, you know, discuss the matter if he brought it back. We can like, you know, take care of the matter after work on that day… So I

---

[6] Citing Federal Rule of Evidence 106, Scott both disputes and objects to this statement. (PRCSMF ¶ 19.) With respect to his objection, he contends that UPS did not submit other testimony which contradicts this statement. This objection is unfounded.  If Scott believes that there is contradictory evidence that was not referenced by UPS, he can and should submit it.  In opposing a motion for summary judgment, a non-movant bears the burden of citing any material that supports a denial of the moving party's facts. LCvR 56(C)(1).

wanted—I thought if Mike Teaters would have brought it back, we could have handled the situation right there. That's why I asked him to bring it back.

     Q. What situation did you need to be handled?

     A. The monkey hanging up where I worked at.

     Q. All right. And once the monkey was removed, was there anything else that you believe needed to happen?

     A. No.

(Scott Dep. 54:11-55:4) (ECF No. 50 Ex. A.) Later in his deposition, however, he was asked if there was anything additional that he wanted HR to do, and he said: "I wanted them to investigate it and find out who hung it up. That's what I wanted them to do, yes." (*Id.* at 155:18-20) (ECF No. 54 Ex. A.) *See also id.* at 65:11-12 ("I wanted them to actually find out who hung it up.")

    On Monday afternoon, Scott spoke to UPS Human Resources (HR) Supervisor Jerry Cooley, Jr. ("Cooley"), who initiated a meeting which also included HR Manager Aaron Zelmore ("Zelmore"). During this meeting, Scott stated he was not sure what the stuffed animal was, but that he believed it was a monkey. (DCSMF ¶¶ 23-25.) Scott also made reports to HR on Tuesday and Wednesday. (PRCSMF ¶ 23.)

    Following this initial conversation with HR, Zelmore set up another meeting with Scott, Ted Miller (the union steward), Teaters, Cooley and Dunn. At this meeting, Teaters identified the animal as a blue sloth and stated that, once he removed it, he gave it to Hixon to place in the over goods room. Teaters also "showed the group a picture of a similar toy that he was able to find through an Internet search on his phone." Following this discussion, Scott confirmed that he did not have any questions. (DCSMF. ¶¶ 27-29.)[7]

---

[7] Scott disputes this statement as requiring a "credibility determination." (PRCSMF ¶¶ 28-29.) If

According to UPS, as Scott did not request any further action at the meeting, the investigation was concluded. Subsequently, however, on or about May 7, 2019, Zelmore received an incident report that Scott had submitted to the local union. In this incident report, Scott again raised an issue about the monkey but did not report any specific issues of racial discrimination or harassment. (DCSMF ¶¶ 31-33.)

The investigation was reopened after UPS received this report. Zelmore and Cooley questioned several employees who worked in the sorting area to ensure any additional information about the incident was assessed with an eye toward a potential policy violation. (DCSMF ¶¶ 34-35.) On May 27, 2019, Cooley met with Dylan Geary ("Geary"), the part-time supervisor in the area, about the incident with the monkey. Cooley also spoke to Hixon, the employee who took the stuffed animal from Teaters and drove it to the over goods room. Both reported that it was a blue sloth. (DCSMF ¶¶ 36-37; DRCSMF ¶ 82.) UPS concluded its investigation after these interviews and determined that no further action was required. (DRCSMF ¶ 82.) According to UPS, the mode of the animal's suspension still had not been specified in the second round of the investigation. (DCSMF ¶¶ 36-38.) Scott disputes this, contending that he reported that the monkey was hanging by its neck approximately ten feet from his workspace. (PRCSMF ¶¶ 37-38.)

Scott contends that UPS's investigation revealed that management was aware that the monkey had been hanging in this position for approximately a month before Scott noticed it. (PRCSMF ¶¶ 70, 72.) By contrast, UPS notes that Geary only indicated only that the animal

---

Scott disputes the accuracy of these concise statements, he is required to set forth evidence that create a disputed fact. He does not deny, other than generally, that he was part of the meeting or that Teaters showed the "group" a photo of a blue sloth that he found on the internet. Whether the photo has been produced during discovery has no bearing on whether the facts set forth by UPS are disputed by Scott, who was present at the meeting in question.

(which he thought was a blue sloth) may have been hanging for a month before Scott reported it and it was immediately removed once he did so. (DRCSMF ¶¶ 70, 72.)

Scott testified that he was offended and that he felt threatened and intimidated by the monkey, and that UPS's failure to identify the individual who hung the monkey caused him ongoing apprehension. (PRCSMF ¶¶ 80-82.)[8] UPS's corporate designee testified that it would be reasonable for a Black employee to feel threatened by seeing a monkey (or even a sloth) hanging by its neck in the workplace, although she also stated that it would depend on the situation and denied that this was an accurate description of what occurred in this case. (PRCSMF ¶¶ 75-79.)[9]

B. Subsequent Events and Scott's Suspension

In Count III of the Amended Complaint, Scott alleges that UPS retaliated against him both for commencing this action and then seeking to amend his Complaint to assert a retaliation claim as a result of an incident that occurred on March 11, 2021.

According to UPS, on March 11, 2021, UPS Security received notice that Scott had been involved in an altercation with a co-worker, Matthew Ingram. Ingram, like Scott, is a mail sorter. The dispute related to whether Ingram or Scott would work with a particular unloader for the day. Ingram reported to his supervisor, Lorena Upton, that during the dispute, Scott threatened to punch him in the face and called him a "punk ass bitch." Upton took Ingram's report but had also

---

[8] UPS cites to other sections of Scott's deposition in which he seemed to acknowledge that his ongoing concerns constituted "overthinking" and being "paranoid." (DRCSMF ¶¶ 81-82.) However, if a witness's deposition contains internal discrepancies, "an issue of fact remains which, if genuine, will preclude resolution of the case on summary judgment." *Airlines Reporting Corp. v. Belfon*, 2010 WL 3664065, at *24 (D.V.I. Sept. 16, 2010). For purposes of this motion, the Court accepts Scott's statements that he remained apprehensive.

[9] Scott states that a similar incident involving a "hangman" occurred at UPS. (PRCSMF ¶ 86.) However, other than a reference to a lawsuit in another district related to a "hangman" incident at a UPS facility in Ohio, Scott has not introduced any evidence that the incidents were similar or part of a pervasive pattern of discrimination and admits that he has no personal knowledge about this incident. (DRCSMF ¶ 86.)

witnessed the incident firsthand. She had been standing behind Scott and Ingram in the aisle, and she was able to see and hear the incident unfold. (DCSMF ¶¶ 57-61.)

Scott contends that Ingram was rude to him and that he simply walked away. (PRCSMF ¶¶ 57-61.) He denies that Upton was present during the incident because he did not see her. Upton testified, however, that because she was standing behind Scott, he could not see her, but she could see him. (ECF No. 50 Ex. K at 57:17-23.) Scott speculates that she must be lying because around this time, she asked Teaters for a transfer and he granted her request. (PRCSMF ¶ 84.) However, the record reflects that Teaters granted Upton's request for a transfer on or about March 16, 2020, approximately one year prior to the incident between Scott and Ingram. (DRCSMF ¶ 84.)

Josh Waller, the Day Sort Hub Manager for the New Stanton facility, had the responsibility to issue discipline to employees, and informed Area Security Manager Brian McKnight that an investigation of the incident was necessary. (Waller Decl. ¶ 6) (ECF No. 50 Ex. D.) Immediately after the incident, Waller made the decision to suspend both Scott and Ingram, otherwise referred to as "placed out of service," pending the outcome of this investigation. (DCSMF ¶¶ 62-63.)[10] The same day, Scott's counsel contacted counsel for UPS and sought consent to amend the complaint to add a retaliation claim relating to Scott's suspension. There is no evidence that when he made the decision to suspend Scott and Ingram, Waller was aware that Scott's pending lawsuit against UPS or that Scott intended to amend his complaint due to his suspension. (DCSMF ¶¶ 56, 63.)

UPS Security then separately interviewed Scott, Ingram and Upton. Scott denied

---

[10] Scott objects to UPS's reliance on evidence that Ingram was also temporarily suspended on the ground that UPS has not supplied documentation of it, citing Fed. R. Evid. 803(7). (PRCSMF ¶ 62.) However, UPS supports this statement of fact by citing to the declarations of McKnight and Pruchnic, which are admissible as explained herein.

threatening to punch Ingram or calling him a "punk ass bitch." Instead, Scott alleged that Ingram had been rude to him and that he simply walked away after the interaction. UPS Security recommended that Scott be discharged, however, because Ingram's version was corroborated by Upton, a member of management. (DCSMF ¶¶ 64-66.) Waller made the decision to terminate Scott based on the report of UPS Area Security Manager Brian McKnight and issued a discharge notice to Scott on March 24, 2021.[11] (*Id.* ¶ 67.) Waller was not working at the New Stanton facility at the time the monkey incident occurred and there is no evidence that he was otherwise aware of it. (*Id.*) McKnight was also unaware of the monkey incident, Scott's lawsuit or his request to amend the Complaint to allege a claim of retaliation related to the suspension. (McKnight Decl. ¶ 14) (ECF No. 50 Ex. G.)[12]

Scott suggests in his brief that by "reporting the hanging monkey to security," McKnight must have known about this incident. (ECF No. 53 at 14.) Scott argues that "as head of security, Brian McKnight would have been aware of Scott's initial reports from April 2019." (ECF No. 53 at 13.) However, he proffers no factual basis for this speculation. More importantly, the protected activity relevant to Scott's retaliation claim is his filing of the Complaint and/or Amended

---

[11] Scott filed the Amended Complaint on March 24, 2021.

[12] Scott objects to UPS's reliance on the declarations of Waller and McKnight on the ground that they were not identified as witnesses in UPS's initial disclosures. This objection is without merit. The initial disclosures of UPS were made on February 8, 2021, prior to the events leading to Scott's suspension. Second, Waller signed the notice of discharge issued to Scott and it was produced in discovery. (ECF No. 56 Ex. J, UPS 254.) McKnight was the head of security who was responsible for the investigation, and UPS revealed his identity to Scott in its response to Interrogatory No. 23. Thus, despite the fact that these witnesses were not initially identified, it is uncontroverted that Scott was aware of their identify and involvement. Thus, the failure to disclose Waller and McKnight in the initial disclosures was harmless because it involved "an honest mistake, coupled with sufficient knowledge by the other party of the material that has not been produced." *Tolerico v. Home Depot*, 205 F.R.D. 169, 176 (M.D. Pa. 2002). Scott has failed to show that he sustained any undue prejudice as a result of the omission of these witnesses from the initial disclosures of UPS. It should also be noted that nothing prevented Scott from taking their depositions, as he did with Upton (who similarly was not identified in UPS's initial disclosures).

Complaint in this case, not the incident that occurred two years before. Moreover, the record confirms that Scott showed the photo to Dwayne Hill, a member of UPS's security team, right after the incident (PRCSMF ¶ 85). Hill was *not* a member of the security team that investigated Scott's altercation with Ingram, and Scott has cited no evidence to the contrary. (DRCSMF ¶ 85.) Moreover, there is no evidence that Hill told McKnight or Waller about what had occurred in 2019.

Scott filed a grievance contesting the discharge. Following the grievance process, UPS Labor Manager Sean Pruchnic decided that the discharge should be reduced to a time lost suspension. This was based on Pruchnic's evaluation of Scott's prior disciplinary history which was clean of any prior instances of workplace violence. Consistent with other disciplinary measures, Pruchnic determined that a policy review and treatment of Scott's existing suspension as "time served" were sufficient disciplinary measures. (DCSMF ¶¶ 68-69.)[13] Scott returned to work on April 16, 2021. (ECF No. 56 Ex. J, UPS 253.)

## III.   **Analysis**

### A.   Standard of Review

The Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of

---

[13] Scott objects to UPS's reliance on Pruchnic's declaration on the ground that he was not listed as a witness in UPS's initial disclosures. Pruchnic was the labor manager who represented UPS at the local hearing following Scott's challenge of his discharge through the grievance process, which was attended by Scott's union representative. (ECF No. 56 Ex. J, UPS 253.) Scott has not contested the accuracy of Pruchnic's declaration and does not dispute that his termination was reduced by Pruchnic to a suspension. Thus, for the same reasons noted above with respect to Waller and McKnight, UPS's failure to list Pruchnic in its initial disclosures was harmless and has not resulted in any undue prejudice to Scott.

any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

      1.   Hostile Work Environment Claim

"Section 1981 prohibits 'racial' discrimination in the making of private and public contracts." *Pamintuan v. Nanticoke Mem. Hosp.*, 192 F.3d 378, 385 (3d Cir. 1999). In employment situations, courts have treated racial discrimination cases in the same manner as cases under Title VII of the Civil Rights Act of 1964. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989); *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (hostile work environment); *Estate of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 798 n.14 (3d Cir. 2010) (retaliation).

The Supreme Court has held that an employee may establish a violation of Section 1981 if he or she can show that discrimination based on a protected characteristic created a hostile or

abusive working environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998). The

Court of Appeals has held that:

> To win, a plaintiff must show that "1) the employee suffered intentional
> discrimination because of his/her [race], 2) the discrimination was severe or
> pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the
> discrimination would detrimentally affect a reasonable person in like
> circumstances, and 5) the existence of respondeat superior liability [meaning the
> employer is responsible]."

*Castleberry*, 863 F.3d at 263 (quoting *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d

Cir. 2013)). *See also Faragher*, 524 U.S. at 786-87 & n.1; *Aman v. Cort Furniture Rental Corp.*,

85 F.3d 1074, 1082 (3d Cir. 1996).

While UPS contends that Scott cannot meet any of these requirements, its position as to

the first four elements is not well founded. As to the first element of intentional racial

discrimination, Scott does not have to identify the person who hung the monkey in order to

demonstrate discriminatory intent. Nor is he required to demonstrate that he was "targeted" by

the placement of the monkey. On the contrary, the Court of Appeals has "never required a

plaintiff to demonstrate direct proof that her harasser's intent was to create a discriminatory

environment." *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 278 (3d Cir.

2001). In any event, he has proffered evidence that he was the only Black employee working in

this area.[14]

UPS's reliance on *Caver v. City of Trenton*, 420 F.3d 243 (3d Cir. 2005) is misplaced. In

that case the plaintiff never saw the racist graffiti or flyers but only heard about them second-

hand. *Id.* at 263. Similarly, in *Brooks v. CBS Radio, Inc.*, 342 F. App'x 771, 776-77 (3d Cir.

2009), the Third Circuit held that a supervisor who directed employees to read a book about

---

[14] In its reply brief, UPS argues that over 100 Black employees worked at the facility (ECF No.
55 at 4). However, this does not address Scott's contention that he was the only Black employee
working in the area where the monkey was hanging.

proper attire in the workplace that contained racially offensive passages had not created a sufficiently severe or pervasive hostile environment. Its conclusion, however, was based on the fact that the supervisor had not read the book and upon being notified of this issue, the employer quickly informed the employees that the book did not reflect the views of the company or its supervisors. These cases bear no resemblance to the facts of this case.

Regarding the second element, the Court of Appeals has noted that "an isolated incident of discrimination (if severe) can suffice to state a claim for harassment." *Castleberry*, 863 F.3d at 265 (single use of the "n-word"). *See Burkes v. Holder*, 953 F. Supp. 2d 167, 179 (D.D.C. 2013) (single display of monkey hanging by a noose was sufficient to state a claim for a racially hostile work environment).

With respect to the third element, Scott testified that he was detrimentally affected by the incident. Scott did not have to explicitly inform management that he was "offended" by seeing a monkey hanging by its neck near his workspace in order to demonstrate intentional discrimination. Indeed, the very fact that he reported it and followed up with an incident report is sufficient evidence that he was offended. *See Mandel*, 706 F.3d at 169 (describing this element as an "inherently subjective question" that "turns on credibility determinations.")

Finally, as to the fourth element, a number of courts have observed that a Black employee could reasonably be detrimentally affected by seeing a monkey hanging in the workplace, including other monkey-related or hanging-related imagery. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1297 (11th Cir. 2012) (when a Black employee repeatedly found bananas placed on his truck, the court stated that: "Given the history of racial stereotypes against African–Americans and the prevalent one of African–Americans as animals or monkeys, it is a reasonable—perhaps even an obvious—conclusion that" the use of monkey imagery is intended

as a "racial insult" where no benign explanation for the imagery appears."); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001) ("To suggest that a human being's physical appearance is essentially a caricature of a jungle beast goes far beyond the merely unflattering; it is degrading and humiliating in the extreme."); *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 911 (8th Cir. 2006) (African American bank teller who was repeatedly called a "monkey" by her coworker stated a claim for a racially hostile work environment). Thus, the hanging monkey would detrimentally affect a reasonable person in like circumstances.

Nevertheless, Scott's claim founders on the fifth requirement, the element of respondeat superior liability. Because Scott bears the burden of demonstrating a basis for employer liability, he must prove either that a co-worker did so but that supervisors knew or should have known about the harassment and failed to take prompt and adequate remedial action to stop the abuse, or that a supervisor hung the monkey. He has not met either showing.

Scott does not contend that a co-worker hung the monkey. Nonetheless, if he had presented evidence that a co-worker did so, that would not end the inquiry as he additionally would be required to demonstrate a basis for employer liability, namely, that "supervisors knew or should have known about the [co-worker] harassment, but failed to take prompt and adequate remedial action to stop the abuse." *Moore v. City of Philadelphia*, 461 F.3d 331, 349 (3d Cir. 2006) (citation omitted). Simply put, there is no evidence in the record to support a liability claim against UPS based on the actions of a co-worker.

The record is undisputed that as soon as Scott reported the monkey to Teaters, Teaters immediately removed the monkey from where it was hanging. While Geary was aware of a stuffed animal that may have been hanging in the workplace for a month, he believed it was a koala or sloth and did not view it as an issue. Perhaps more importantly, Scott did not see it until

14

April 5, 2019, and therefore, it could not have detrimentally affected him before then. As noted above, a hostile work environment claim cannot be predicated upon acts that that plaintiff does not witness first-hand. *See Caver,* 420 F.3d at 263. Thus, hostile work environment claim based on the presence of a hanging monkey above his workstation first arose on April 5, 2019, the date that Scott first observed it.

Even assuming that the monkey hung in the area for a month and was not promptly removed,[15] however, the remedial action taken by UPS was "adequate" as a matter of law. "An employer's remedial action is adequate 'if it is reasonably calculated to prevent further harassment.' Accordingly, the employer cannot be liable … if its remedial action stopped the harassment." *Huston v. Procter & Gamble Paper Prod. Corp.*, 568 F.3d 100, 110 (3d Cir. 2009) (quoting *Knabe v. Boury Corp.*, 114 F.3d 407, 412 n.8 (3d Cir. 1997)). *See also Andreoli v. Gates,* 482 F.3d 641, 644 n.2 (3d Cir. 2007) ("A remedial action that stops the harassment is adequate as a matter of law.")

Moreover, "an employee cannot dictate that the employer select a certain remedial action." *Knabe*, 114 F.3d at 414. In fact, "if the remedy chosen by the employer is adequate, an aggrieved employee cannot object to that selected action." *Id. See Robinson v. Home Depot, Inc.*, 2009 WL 2960990, at *21 (D.N.J. Sept. 11, 2009) (when Home Depot investigated a noose in the workplace within twenty-four hours of being informed about it and met with plaintiff to

---

[15] The cases cited by Scott regarding what may not be adequate prompt action do not assist this inquiry. In *Lake v. AK Steel Corp.*, 2006 WL 1158610, at *27 (W.D. Pa. May 1, 2006), a noose had been in a lunchroom for three years, which the court described as "an extended period of time." *See also Jensen v. Potter*, 435 F.3d 444, 453 (3d Cir. 2006) (the court could not deem the Postal Service's response prompt and adequate as a matter of law when a meeting between management, union officials and the principal harasser did not occur until repeated complaints were made, 19 months of harassment occurred and a new supervisor intervened), o*verruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

address his particular concerns regarding the incident, it demonstrated prompt and adequate remedial action even though no employee was punished because the investigation was inconclusive).

It is undisputed that after the monkey was removed, no further incidents of discriminatory conduct occurred. While Scott was dissatisfied with the actions of UPS,[16] UPS met several times with Scott about the incident and performed some investigation. A week or so after the initial investigation concluded, Scott submitted an incident report to his union and again raised an issue about the hanging monkey. He did not, however, report any new conduct of racial harassment or discrimination. UPS reopened the investigation after receiving his report and several employees were questioned with inconclusive results. In any event, the issue is "not whether the investigation was adequate … but rather whether the remedial action was adequate." *Knabe*, 114 F.3d at 412. In *Knabe*, a waitress complained of being sexually harassed by a restaurant manager but the supervisor who investigated the complaint erroneously believed that Knabe had to present corroborating witnesses and thus concluded that she could not make a finding that she had been harassed by the manager. Nevertheless, because the supervisor informed the accused manager that the company would not tolerate harassment and nothing further happened, the court concluded as a matter of law that the remedial action was "adequate."

With respect to supervisors, although Scott contends that Teaters or Dunn may have hung the monkey, this assertion is based on only his speculation from their reactions to the incident. According to Scott, Teaters failed to bring the monkey back to him so that he could see it and

---

[16] Scott argues that Teaters "sabotaged the investigation" by not bringing the monkey back to him as he requested but instead disposing of it; UPS downplayed the incident by insisting that the animal was a blue sloth and simply treating it as an over good; Teaters or Dunn may have been responsible for hanging the monkey; UPS did not find out who was responsible for hanging the monkey; and that no one was reprimanded or punished for the incident.

Dunn aggressively denied hanging it when Scott merely inquired if he knew about it. Without more, this does not constitute sufficient evidence to create a genuine issue of material fact that either of them was the perpetrator. Scott cites no authority that would permit a fact finder to draw the conclusions he suggests based solely on a plaintiff's suppositions.

In any event, even if Scott is given every benefit of the doubt on this issue, his claim of employer liability based upon the possible involvement of a supervisor still fails as a matter of law. In *Faragher* and *Burlington Industries v. Ellerth*, 524 U.S. 742 (1998), the Supreme Court held that "an employer is not 'automatically' liable for harassment by a supervisor who creates the requisite degree of discrimination." *Faragher* 524 U.S. at 804. Rather, it would "implement clear statutory policy ... to recognize the employer's affirmative obligation to prevent violations and give credit … to employers who make reasonable efforts to discharge their duty." *Id.* at 806. "Thus, the employer that adopts appropriate training and reporting procedures is not required to successfully prevent harassing behavior … but must take reasonable steps to promptly correct a hostile environment once the employer has knowledge of its existence." *Cajamarca v. Regal Ent. Grp.*, 863 F. Supp. 2d 237, 252-53 (E.D.N.Y. 2012).

Waller, Zelmore, McKnight and Pruchnic all testified that "UPS's Code of Conduct and Anti-Harassment Policy expressly prohibit, among other things, discrimination based on race, as well as retaliation. These policies are contained in UPS's Employee Handbook, which is available to all UPS employees. The policies are also available on the UPS Intranet. UPS also provides a toll-free help line to assist employees in making complaints." (Waller Decl. ¶ 14; Zelmore Decl. ¶ 14; McKnight Decl. ¶ 15; Pruchnic Decl. ¶ 12.) This evidence is uncontroverted. As explained above, it is undisputed that Scott complained about the monkey, thereby invoking the UPS policy, and that UPS took prompt and adequate remedial action to

address the issue.

The Court does not suggest that simply removing an offending object represents the best response by an employer. Indeed, it may not represent adequate remedial action if further incidents ensue. *See, e.g., Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1149-50 (10th Cir. 2008) (when an employer repeatedly responded to reports of racist graffiti by simply removing it without investigating, a genuine issue of fact was presented as to whether its response was adequate). Further, the Court understands that witnessing a hanging monkey in his workplace reasonably would be offensive to Scott. At the same time, no further discriminatory acts occurred.

As reflected in the record, the identity of the person who hung the monkey was not determined by UPS. The Court of Appeals has held that even when the identity of the offender is known, however, "taking punitive action against the harassing employee, e.g., reprimand, suspension or dismissal, is not necessary to insulate the employer from liability for a hostile work environment." *Knabe*, 114 F.3d at 414 (footnote omitted). Indeed, when "the plaintiff has presented no evidence that a nonpunitive remedial action was not reasonably calculated to end the harassment, summary judgment for an employer is appropriate." *Id.*

Because UPS took prompt and adequate remedial action, Scott's claim of a racially hostile work environment fails as a matter of law. Therefore, with respect to Count I, UPS's motion for summary judgment will be granted.

### 2.  Retaliation Claim

When a plaintiff alleges a retaliation claim under § 1981, courts apply the shifting burden test first applied to claims under Title VII in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). As the Court of Appeals has explained, a plaintiff:

bears the initial burden of establishing a prima facie case by a preponderance of the evidence. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). When a plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. If the defendant meets this burden, the presumption of discriminatory action raised by the prima facie case is rebutted. *Tex. Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The plaintiff then must establish by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination, and not the real motivation for the unfavorable job action. *Id.* at 253, 101 S.Ct. 1089; *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817.

*Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797-98 (3d Cir. 2003) (footnotes omitted).

The prima facie case elements for a retaliation claim are as follows: 1) the employee engaged in activity protected by the anti-discrimination statute; 2) the employer took action that a reasonable employee would have found to be materially adverse in that it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination; and 3) there is a causal connection between the employee's opposition to or participation in proceedings against unlawful discrimination and the employer's action. *Moore,* 461 F.3d at 341-42.[17]

The sole remaining retaliation claim is set forth in Count III of the Amended Complaint. Scott asserts that UPS retaliated against him for filing this lawsuit by falsely accusing him of threatening a co-worker and then engaged in continuing acts of retaliation by continuing his suspension when he sought to amend his Complaint. UPS argues that Scott cannot state a prima facie case of retaliation discrimination because he was suspended prior to making a request to

---

[17] The Supreme Court has held that in a Title VII case, retaliation must be proved by but-for causation. *University of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338 (2013). Whether this standard also applies to cases under § 1981 is an unresolved issue. *See Motto v. Wal-Mart Stores E., LP*, 563 F. App'x 160, 164 n.3 (3d Cir. 2014). The Court need not resolve the issue in this case because, as in *Motto*, Scott cannot make the required showing of a prima facie case of retaliation.

amend the Complaint[18] and because he has failed to point to any causal link between the filing of the Complaint or the Amended Complaint and the alleged retaliatory suspension.

The filing of the Complaint and Scott's subsequent request to amend it represent protected activities. Moreover, the allegedly false accusations, Scott's suspension and his termination (albeit later rescinded) constitute adverse employment actions. However, he has failed to elicit any evidence that supports a causal connection between his protected activities and the adverse employment actions. Scott filed this action on November 6, 2020. He was not accused of engaging in an altercation and suspended pending an investigation until March 11, 2021, over four months later. This is too distant to demonstrate temporal proximity. *See, e.g., Leboon v. Lancaster Jewish Community Center Ass'n,* 503 F.3d 217, 232 (3d Cir. 2007) (a gap of 3 months between protected activity and adverse action, without more, is insufficient).

In addition, although Scott was discharged by Waller on March 24, 2021, after the Amended Complaint was filed, it was the culmination of the investigation into his workplace altercation with Ingram, which preceded his notice of an intent to amend. Without evidence that Waller knew about the amendment, there is no evidence of a causal connection.

At any rate, even assuming that Scott has stated a prima facie case, the burden of production then shifts to UPS to articulate a legitimate, non-discriminatory reason for its action. UPS has proffered as its legitimate, non-discriminatory reason for Scott's suspension its conclusion that he was the aggressor in the altercation with Ingram. UPS has thus satisfied its relatively light burden of production. *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997).

---

[18] However, the Amended Complaint alleges that Scott engaged in protected activity when he filed and maintained this action, which obviously occurred before the incident on March 11, 2021.

Therefore, the burden then shifts back to Scott to proffer evidence from which the trier of fact could conclude that this reason is a pretext for unlawful retaliation discrimination. As the Court of Appeals has explained:

> To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."

*Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (citations omitted). The evidence submitted by a plaintiff seeking to avoid summary judgment on this issue "must allow a factfinder to reasonably infer that each of the employer's proffered non discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Id.* at 764 (citations omitted).

Scott proceeds along "*Fuentes* prong one" by arguing that he has submitted evidence from which a factfinder could reasonably disbelieve the employer's articulated legitimate reason for his suspension and termination. *Keller v. ORIX Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc).[19] The Court disagrees. Simply put, Scott has failed to submit any evidence that show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" from which a fact finder could reasonably disbelieve UPS's articulated reason for disciplining Scott. Although he contends that multiple decision makers were untruthful, these assertions lack any factual basis in the record. Scott argues that Upton lied about seeing him

---

[19] To assert "*Fuentes* prong two" would require Scott to argue that he has proffered evidence that "allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Keller*, 130 F.3d at 1111. He has not made this argument.

threaten Ingram during the altercation and that her motive was to receive a favorable transfer from Teaters. Notably, the uncontroverted evidence confirms that Upton was transferred a year before the incident, and Scott proffers no other evidence to support his bald allegation that she lied or indeed, had any motive to lie.

Scott further argues that Waller's proffered testimony about why he decided to suspend and then terminate Scott similarly should be disbelieved. He fails to point to any evidence that supports a conclusion that Waller did not make his decisions due to Scott's altercation with Ingram. Waller received a report about the altercation, suspended Scott pending an investigation and concluded based upon the results of the investigation that Scott should be terminated. The issue is not whether Waller and McKnight were "right" when they chose to believe Ingram and Upton rather than Scott about the altercation or whether the decision to suspend his employment was too harsh. A court "do[es] not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practice, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [discrimination laws do] not interfere." *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 332 (3d Cir. 1995) (citation omitted). *See also Keller*, 130 F.3d at 1109 ("The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination].") Rather, the issue is whether the proffered reason for suspending his employment is a pretext for unlawful retaliation.

As explained above, McKnight has testified that he was unaware that Scott had filed a lawsuit at the time he investigated the altercation between Scott and Ingram, and Waller has testified that he was unaware of the lawsuit at the time he made the decision to terminate Scott's employment. In addition, the decision to reduce the termination to a suspension was made by

Pruchnic, who was also unaware of the lawsuit at the time. As the Court of Appeals has held: "It is not reasonable for a factfinder to infer that an employer's reaction was motivated by an intent to retaliate for conduct of which the employer's decision maker was not aware." *Moore*, 461 F.3d at 351.

Without any evidence that creates a genuine issue of material fact about his retaliation claim, Scott can only suggest that all of these witnesses may be lying.[20] Without contradictory evidence, however, his contention fails as a matter of law. *See Kautz v. Met-Pro Corp.*, 412 F.3d 463, 475 (3d Cir. 2005) (rejecting plaintiff's request to assume that a witness's testimony was false because he was an interested party without coming forth with specific evidence contradicting the testimony); *Coulton v. University of Pa.*, 237 F. App'x 741, 749 (3d Cir. 2007) (when terminated employee offered only reasons that the University should not have believed the allegations lodged against him and listed purported deficiencies in the investigation, the court rejected these arguments as "beside the point"). Scott denies that he was the aggressor in the interaction with Ingram, but an employee's "denial that he engaged in the conduct for which he was purportedly terminated is insufficient to create a genuine issue of material fact." *Ade v. KidsPeace Corp.*, 401 F. App'x 697, 703 (3d Cir. 2010) (citation omitted).

Scott has failed to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Burton v. Teleflex, Inc.*, 707 F.3d 417, 427 (3d Cir. 2013). Therefore, the motion for summary judgment of UPS with respect to the retaliation claim in Count III will also be granted. Further, as Scott represents

---

[20] As previously discussed, Scott's argument that Waller, McKnight and Pruchnic cannot proffer declarations in support of UPS's position is unavailing. In any event, even if their testimony is excluded, Scott's retaliation claim nonetheless fails because there is no evidence of pretext.

that he is no longer pursuing the retaliation claim in Count II of the original Complaint, summary judgment in favor of UPS will also be granted as to this claim.

**IV.**     **Conclusion**

For all of these reasons, the motion for summary judgment of UPS will be granted. An appropriate order follows.

Dated: May 26, 2022                                    BY THE COURT:

                                                                    s/ Patricia L Dodge
                                                                    PATRICIA L. DODGE
                                                                    United States Magistrate Judge